May it please the Court, good morning. My name is Charles Grubbe. I'm an Assistant Attorney General and Senior Agency Counsel at the Arizona Attorney General's Office. Also with me today is Mr. Joseph Scarrotta, who is General Counsel to the Arizona Department of Administration. I represent the Governor of the State of Arizona and two officials of its Department of Administration who appealed the entry of a preliminary injunction. Since this is a preliminary injunction review, of course, the standard of review is quite restricted. But there are some background matters that I think are necessary to understanding the issuance of the preliminary injunction and the technical arguments that we raised, that principally the district court applied the wrong standard in deciding the preliminary injunction here. And those facts can be stated very rapidly. Please tell me if I speak too fast, and, Your Honor, with your permission, I would like to reserve about five minutes of my time for rebuttal. That shows your whole time, so you'll have to help keep track of it. Thank you. Prior to 2008, Arizona, like about two-thirds of the State and the Federal Government, offered an employee benefit of health insurance. Now, the Arizona plan, unlike many, is a self-insured plan, which is why you may have heard quotation marks around the word insurance. Ours is a circumstance where the state pays a portion of a premium. That total amount goes into a health care trust fund administered by the Department of Administration, and that money is actually used to pay hospitals, doctors, and other health providers. This isn't a circumstance, as in many other cases, where simply a policy of insurance is purchased from a third party. This is one where the state's the payor. In 2008, the State of Arizona did something different from the other two-thirds of the States and the Federal Government, and authorized a domestic partner benefit. The domestic partner benefit in this case starts with the model, the model that existed in 2008, that an employee could participate in this insurance plan, but also an employee's spouse and dependent children. The change in 2008, which was made by an administrative rule, not legislation, created a domestic partner benefit whereby an unmarried domestic partner who otherwise met some requirements in a rule, I reproduced the entire rule in the addendum to our brief so you could see the full context of it, and it focuses mostly on financial and qualified domestic partner. The 2008 rule doesn't distinguish between same-sex spouses and opposite-sex spouses. The program was created to serve all. In 2009, faced with an unprecedented budget crisis, the Arizona legislature changed the definition of dependent as it applied to that portion of the statutes that changed the definition to mean, literally, an employee who can participate, the employee's spouse, and dependent children. Can you be a same-sex spouse in Arizona? You cannot, Your Honor. The State of Arizona does not recognize same-sex marriages performed even in other jurisdictions that do authorize them. The effect, of course, and perhaps the keystone of the legal argument on the merits in this case, is not that the budget reconciliation bill that we're looking at today somehow contains a facial discrimination against same-sex couples, but when you read that together with Arizona's provision that there are no same-sex spouses, that it creates an exclusion. Doesn't it?  There's no doubt about it, Your Honor. And the legislature set out to take the entire domestic partner program and, at least for the time being, go away from it. And they did it in a budget reconciliation bill. I reproduced the entire bill as an addendum to our brief because I think you need that background as well. This was not a single targeted legislative enactment aimed at a single group of people, contrary to some of the findings of the district court and the allegations of the amended complaint. Instead, that bill does a lot of things. It took appropriated, previously appropriated monies away from agencies to the tune of many, many millions of dollars. The legislature did that because it had previously, in a previous budget cycle, appropriated monies to the domestic partner program, to other programs, the Department of Administration, programs of my office, for that matter. We suffered in the budget reconciliation bill as well. And because of the downturn in the economy, all that familiar background, there simply were not tax collections sufficient to pay for appropriations that had already been made. That's why this is a budget reconciliation bill. This is not a circumstance where they were thinking about new appropriations or really even taking money and appropriating it to different purposes. They were restricting appropriations in an attempt to balance the budget. Well, if all that is true, why are you arguing, then, that one of the purposes of legislation is to promote marriage? Your Honor, I'm frankly delighted to start with that. The district court found, of course, that the State had offered certain specific justifications for the statute. That overstates things a little bit. What the State did was to rely principally on the case law that says that a person challenging a statute has the burden to negative every possible justification for it. And what we did in the court below, rather than asserting, as one would in a strict scrutiny case, that these are our compelling interests, what we said was, Judge, you can look at this and see that it is served by all these many justifications. Principal among them, because this is a budget reconciliation bill, the saving of money. But since it had the effect of taking a large number of unmarried people who otherwise were entitled to this benefit and leaving them without it, that also served the other purposes, administrative efficiency and the longstanding, well-recognized State interest in favoring marriage. The district court found a little differently. The district court said, well, it seemed to the district court irrational to say that the purpose was to encourage people to get married. And we didn't argue that its purpose was to encourage people to get married. What we argued was, much like in the Social Security system and other places where married persons are treated differently, that it's part of a whole number of distinctions that States legitimately can use to favor persons who are married over persons who are not. It's not an incentive argument, Your Honor. It's a favoring marriage. I just reviewed the transcript of the hearing and that you seem to be making an incentive argument or a promotion argument in the district court. Well, I reviewed it, too, Your Honor, and I did that argument. And I don't remember arguing an incentive for individual persons to abandon their unmarried status and go and get married. No, I think you used the term promotion of marriage. I did. Yeah. One reason we could say incentive, but I guess we're just, it really doesn't make much difference, does it, in terms of the analysis? In terms of our analysis here today, I don't think it does, Your Honor. I don't think it does. Because you rely on three primary purposes of the statute, budgetary, administrative efficiency, and the promotion of marriage, right? That is principally it, Your Honor. Although, once again, what we principally rely on is that as long as there is a rational basis for the statute, a person challenging it bears the heavy burden to make negative every possible justification for it, not just the real ones. Your Honor, there's a nice case law. A couple of the cases that we cited in our briefing have a reference to this. And it's that it's never appropriate for a court to assume that a legislature has done something with an evil intent, even when the legislation may have a disparate impact or even a bad impact. That it's just not appropriate for a court to assume that a legislature acted with bad intentions. It's particularly appropriate in this case to not make that assumption. Because, you know, logically, Your Honor, the persons who were injured most, the largest number of persons who were ousted in the domestic partner, ousted of the domestic partner benefit, according to the affidavit of the experts supplied by the plaintiffs, the vast majority of those were opposite-sex couples. So it wouldn't be appropriate to assume that the state legislature's aim was so bad that it hit all of those opposite-sex couples somehow intending an invidious discrimination against the same-sex couples. And, Your Honor? Yes, but the opposite-sex couples, for the most part, can do something about it and become spouses, whereas the others can't. And we're right back to that definition of marriage, Your Honor. It's tempting to say that this is a case that challenges the definition of marriage, because if that wasn't there, there would be no logic to this position. But, of course, what's before us is a challenge to a statute that creates a new definition of dependent. And our position is that the district court proceeded in an inappropriate fashion. The standard of review for a preliminary injunction, of course, is not to reach the merits. It is to look at whether the court applied the correct legal standard. We cited the Toyo Tire case stating that standard, and cited it for the proposition that if this Court finds that the incorrect legal standard was applied, this Court should reverse. We've made three arguments about an inappropriate legal standard. First and foremost, the one that we think is easily the most important of them is the fact that the court here actually assumed the truth of the allegations of the amended complaint for purposes of deciding the preliminary injunction motion. Mr. Groovy, I know that's your first argument. I don't really see it that way, because I thought the district court made clear by prefacing as discussed above, construing the facts alleged in the complaint as true. The district court was talking about that portion of the ruling that came before on the motion to dismiss. And then the district court goes on to say, in support of their motion for preliminary injunctive relief, I'm now quoting from page 8 of your brief and page 25 of the record, the plaintiffs attached further evidence. So the district court judge wasn't relying on ñ he didn't conflate the two standards. He simply addressed the one standard that was appropriate for the motion to dismiss and then referenced it because he already found that the motion to dismiss should be defeated because essentially the plaintiff had a chance of prevailing on the merits. So I think your first argument is mostly smoke and mirrors. I don't think that's what the district court did at all. With your permission, Your Honor, let me see if I can move the smoke and mirrors.  Thank you. Because I think you need to look one level deeper than that. Obviously, we think the Court said what he was doing there on ER 25. It said, as discussed above, construing the facts alleged in the complaint as true, plaintiffs have demonstrated that the absolute denial was not rationally and substantially related. Let me stop you there. You do not dispute that that is the correct standard in analyzing whether or not to grant a motion to dismiss? Oh, no, Your Honor. That's exactly the right standard. We argued it below, and certainly the Court granted our motion to dismiss in part. But what does the word, as discussed above, refer to? It refers to the motion to dismiss. It certainly does, Your Honor. But this discussion appears in the discussion of the preliminary injunction, and it has the Court concluding that the plaintiffs demonstrated. The plaintiffs demonstrated. Now, demonstrated means something here. In the preliminary injunction setting, the plaintiffs bore the burden of proof on everything necessary to injunctive relief. State didn't. The plaintiffs did. Now, I don't think you can read, as discussed above, Your Honor, by way of the district court saying, you know, I've already told you that taking the facts as true, I think they made this case. Because he said that over and over and over in the first part of this. So unless you're prepared to say that this sentence is mere surplusage, it has to mean something. And I think what it says is, and reading it fairly with your other point, what the Court is saying is, I'm taking the allegations of the amended complaint as true for purposes of determining that the plaintiffs have demonstrated that the statutory change is not rationally and substantially related. But then the Court goes on to talk about how the plaintiffs attached further evidence. Well, Your Honor, that means that what he was talking about up ahead had to have been evidence, because he talks about further evidence then. And if you look at the evidence that the Court refers to, it doesn't support that conclusion by itself. The Court talks about a report on the administrative efficiency of benefit options, which is the name for this benefits plan. Well, all that really says is that the State ran it well and efficiently. So that certainly isn't going to provide any proof that it wasn't rational, that the statutory change wasn't rationally related. And then the Court goes on to talk about how the plaintiffs attached evidence showing that the domestic partner coverage would cost the State about 3 million bucks and some prognostications about how little it would cost going forward. Okay. We can argue about whether those are good facts, but that's got nothing to do with rationally and substantially related, which the Court has already determined as a matter of fact. I thought the – I thought he was just summarizing the evidence. That's what I took in. I mean, I – he says the standard for preliminary injunction, right, and that doesn't have anything to do with the motion to dismiss standard and the motion for preliminary injunction. The plaintiffs have to prove it. And so he summarized that. He goes on to summarize what he's done before, and then he starts summarizing the proof. It seems to me that's what he's doing in the decision. Your Honor, I don't think it can fairly be read that way, because first he states the standard. Right. And you don't disagree with the standard that he stated, do you? He, in fact, got the standard exactly right. Yeah. But he got the standard exactly wrong when he said he could assume the truth of the allegations of the amended complaint as part of making that standard determination. That really is the gist of the argument. Okay. You have about three minutes left. Three-and-a-half minutes. May I reserve? Thank you, Your Honor. May it please the Court. My name is Tara Borelli. I'm appearing today on behalf of the Plaintiffs' Appellees. I'm joined today by Jenny Pizer, also with Lambda Legal and co-counsel for the Plaintiffs' Appellees. So I'd like to reiterate, in fact, the standard that Mr. Gruby stated earlier on this preliminary injunction appeal. Of course, the correct standard is an abuse of discretion. You'll have to keep your voice up. The acoustics aren't great here. Yes. Thank you, Your Honor. The primary question before Judge Sedgwick was whether the State of Arizona has any employees unequally for performing equal work. The answer is no, and Judge Sedgwick did not abuse his discretion in so finding. Section O separates out gay employees and gay employees only, and deprives them of any pathway to access this part of their paycheck, while all heterosexuals remain eligible for family coverage. The interests offered by this State, and I'll say a few more about them in a couple of moments, they're either constitutionally impermissible as a matter of law, or they Section O or both. Judge Sedgwick was squarely within Federal precedent when he found, first, that the State cannot achieve cost savings or administrative efficiency savings at the expense of this vulnerable minority group. And, second, that placing lesbians and gay men on a lower pay scale does not make anybody else's marriage more secure, nor does it advance the interests of anybody's children. In fact, it actively harms the interests of gay employees' partners' children, though they're no less worthy of the same coverage that others receive. Judge Sedgwick then clearly considered, but could not conceive of any other legitimate government interest that's even rationally related to the unequal treatment in Section O, and he's correct. Yet further proof of this is the desperate argument offered up by the defendants for the first time in this case, in a reply brief on appeal, no less, that the State as an employer offers these benefits to prevent its employees from being hauled off to jail. Well, it's just a specious argument. History tells us, and our experts' declaration confirms, that employers offer these benefits to prevent employees from going to other employers, not to prevent them from going to jail. Lesbians and gay men are similarly situated in every relevant respect for these purposes. They clock in at the same jobs. They perform the same valuable service. They deserve the same compensation. Judge Sedgwick was correct when he noted that it is the rule of the Ninth Circuit that constitutional injury often can constitute irreparable harm. More to the point, this is precisely one of those cases, and the defendants don't even attempt to argue otherwise. No monetary compensation can later make up for the harm that the State does. Why is that? I mean, you have the – these are typically the kinds of things that one can recover damages for in, say, a tort case. So the primary harm alleged is financial, is it not? That's incorrect, Your Honor. There are a number of reasons to understand the harm here as irreparable. The first is the general rule that Judge Sedgwick correctly stated and, in fact, analyzed and applied to this case, and that's the rule that there are constitutional violations that money cannot make up later. For example, no money award later can make up for the harm that the State inflicts when it marks its gay and lesbian employees for inferior treatment and inflicts upon them the daily stress and anxiety of being uninsured or underinsured. Chief Judge Kuczynski – Do you have a case that says that – I know we have some reference in one of our cases, but I've looked around and I don't see many cases where anxiety and stress constitute irreparable harm in this context. And the reason I'm particularly concerned about it is that post-Winters we have to look very carefully at irreparable harm. What this policy does, Your Honor, is that it requires lesbian and gay employees to go to work every day with the humiliating message that they are not equal and their families are not equal. An important part of what cannot be restored later to these plaintiffs with a check is that kind of loss of dignity, and that's precisely why constitutional violations often are presumed irreparable. So, for example, the defendants have argued at different points that there may be some few plaintiffs who might have the luxury of trying to get another plan, an individual plan, but we know those plans will not provide the same kind of coverage that the State offers through its group plan. Individuals can almost never secure that kind of coverage. But when courts were dealing with lunch counter issues in the 1950s, it was true that those individuals could have gone to another shop, they could have gotten another sandwich, but that didn't cure the harm. It wouldn't have been an answer then. And separately, the defendants also – So how is this different from the pre-2008 situation in Arizona? Your Honor, the Court is referring to prior to the administrative regulation. Well, in fact, gay and lesbian employees have always had the right to equal treatment, and the defendant neither enhances nor diminishes that right. It's defined by the 14th Amendment. Contrary to what the defendants have said, the equality right is located in the 14th Amendment, not the administrative regulation. And so they have had this right to equal treatment no matter how long they have had to put up with the discrimination. The fact that the defendant temporarily stopped discriminating against these employees doesn't alter that right. But it does do two important things. It does make particularly clear that there was an intent to discriminate against this group. The State took a well-functioning system and dismantled it. There can be no question they recognized the need, they provided for it, and then they took it away. It's intentional. Well, the State makes a major point of the fact that there are many systems that do not offer these benefits to domestic partners. There are a number of States that don't offer these benefits, and the Federal Government currently does not. Right. But that said, the fact that the law has not yet addressed every potential equal protection violation does not mean that this claim isn't valid. When the Supreme Court desegregated our public's ---- Well, are you arguing that all of those are unconstitutional? This case doesn't necessarily answer that question, Your Honor. This case might have implications for some of those questions, but it doesn't necessarily answer them. It might depend on whether another State would think it has a different interest. To be clear, I can't conceive of what they would be. I'm skeptical that the State of Idaho has any greater interest in discriminating against its gay and lesbian employees than does the State of Arizona, but that would be tested in the same way that the interests are being tested in this case. And I would note, in fact, the question about the Federal Government's discrimination is, in fact, now a question being pressed in the Federal courts, the ---- Yes, Your Honor. You're not attempting to distinguish a system that's set up from the get-go as excluding domestic partners and covering only spouses in this situation where you had a change? No, Your Honor, because that would accept the idea that a defendant could somehow alter the right of the plaintiff. I suppose, but doesn't that cut against your stigma argument? Yes. I mean, to get to irreparable harm, it seems to me, you have to show your argument is that there is a stigma attached to it. But the stigma attaches in Arizona because Arizona provided a benefit to domestic partners, period, and then changed the benefit. Isn't that a difference? To the contrary, Your Honor. The stigma is always there. When gay and lesbian people are treated unequally, when they're separated out and they're treated as inferior because they're not provided the same compensation and they're sent a message that their kind is not welcome when it comes to the company plan. I'm not saying that that's not a valid point, but what I'm saying is if that's true, then there's nothing about the irreparable – it changes the irreparable harm analysis, it seems to me. Let me offer another way of viewing irreparable harm in this case, Your Honor. Although we believe strongly that that constitutional injury argument, the fact that gay and lesbian people have had to live with discrimination for a very long time and they have had no other choice does not somehow diminish the stigma of that discriminatory treatment. It just means that we as a society evolve, and Justice Kennedy spoke beautifully about this in Lawrence. The times can blind us to certain truths, and later generations can see that laws once thought necessary and proper, in fact, serve only to oppress. But another way to view the irreparable harm is that we have a set of plaintiffs before this Court. They represent a range of harms, a degree of harms, but not quality of harm. Each harm is irreparable. What Section O does is it sets up a system where, by and large, heterosexuals will have access to health care, and lesbians and gay men will not. Because when you take away the insurance card from a person, that often means that unless we're talking about life-stabilizing treatment in an emergency room in the most dire of circumstances, often that person won't be able to get access to the health care they need. Well, most of your affidavits indicate that health care is available, it's just more costly. Well, in fact, there are a number of people who could not possibly buy an insurance plan, even if they could afford it, because they have very serious preexisting conditions. Some have conditions that would inevitably lead to reversible health consequences if, in fact, they were denied reliable access to ongoing medical care. That's the case, for example, with a torn carotid artery. I think you've got maybe one affidavit, maybe two, that indicate that the person has actually gone out and sought private health care. The rest basically say we don't think we can get health care because of a preexisting condition. Well, we know how the system works. The elimination of preexisting conditions, and I'm assuming that that part of Federal health care reform actually will be implemented, but we've yet to see, that will not take effect until 2014. And under our current system, people who have diabetes, high cholesterol, high blood pressure, asthma, those people are routinely rejected. Right. But that's not anywhere in your affidavits. That's not in the proof of the case. We're talking about a very small slice of this litigation. And later you may be able to prove that, but I'm just focused on irreparable harm and the proof that's in the record. So you and I may say, well, that's how we think the system works, but we can't base a judgment on that. We have to look at what the proof is in the record. So where is your proof in your affidavits that no one can get health insurance, either through the Medicaid system in Arizona or through private health insurance? Well, Your Honor, as far as the Medicaid system is concerned, this goes to the first point. Judge Sedgwick correctly stated what is an existing rule in the Ninth Circuit, and that is that constitutional injury generally constitutes irreparable harm. Yes, I understand that. And the access point, access is Arizona's Medicaid program. That actually illustrates this point perfectly, Your Honor. Because when we're talking about access, it is in fact an inferior plan. It does not provide the same terms. Many plaintiffs won't qualify because you have to demonstrate a certain level of impoverishment in order to qualify. So many will not have access and it won't be an option for them. For those that do, it will be inferior coverage because the plan denies certain things. Now, that is an example of what the State can do. It can do, but the question is what's in the record of this case that shows that? I'm not trying to be tricky about it. I'm asking you to point to the record and help me out. Yes. Well, the Court might think of this in two ways. The first way, Your Honor, is that when it comes to saying for these employees that it's enough to avoid the constitutional injury to say that they may be able to qualify for access. We could think about it this way. If you had a government plant and it offered a cafeteria with a subsidized lunch and everyone was allowed to eat at that cafeteria except for the female workers, it wouldn't be an answer that there was a soup kitchen down the street. We would never think it was acceptable to say or that it would eliminate that stigma of discriminatory treatment, which, in fact, cannot later be compensated for and this harm is common to all plaintiffs. But, Your Honor, these plaintiffs are in different circumstances. Some of them, as I mentioned, may suffer irreparable harm because they will have irreversible health consequences that they can't avoid if they lose immediate access to health care. Others have preexisting conditions and they've testified that they've repeatedly been refused. For example, Beverly Sechinger testifies that she has repeatedly, over and over again, been told, there is no plan that we will sell you because your partner has asthma. The same thing is true with the testimony for Ruben Jimenez, the partner of Bob Diaz. He's got high cholesterol and type 2 diabetes. No plan, a private insurance broker told them, would possibly cover him with those conditions. So a number of these plaintiffs have, in fact, been told that. But separately, in addition, the Court might think of it this way. We would never think it was okay to say to another group that we don't value you equally. And so while everybody else receives as part of their compensation access to the company plan, your kind isn't welcome and your family has to go down the street and use the poverty plan. Sotomayor, would you explain to me, let me get at this a little different direction, how did this work when the statute was amended? What happened? Does the record reflect that? Was there an immediate purging of the roles or? No, there was not, Your Honor. There was initially some confusion over when the State would begin to implement the law. There was then an attorney general opinion issued saying that, in fact, the plan would continue to offer coverage because people already had enrolled in the plan by the time the statute was passed. So the plan would continue to offer coverage for the remainder of the year, and that was set to expire on October 1st of 2010, which was the end of the health plan year. The health plan year was then extended through December 31st to ease compliance with Federal health care reform. The injunction was entered and took effect on August 6th. So were it not for the injunction, the access to this health care would have ended on December 31st, but currently, gay and lesbian employees continue to access the plan because of the injunction. And so if I may, I would like to turn to a couple of the points that opposing counsel addressed. You have to speak up. I can't hear you. Yes. Let me turn to just a couple of the points that opposing counsel raised during his argument. Opposing counsel mentioned that this is a self-insured plan. I just want to point out, and I'm not sure he was suggesting otherwise, but that does not have a bearing on the claims here for these plaintiffs. It doesn't matter that it's self-insured. That, in fact, makes it that much easier. It's much easier for the plan to provide fair terms to the employees. This plan should be understood as intentionally discriminating against sexual orientation in at least three ways by its very terms. What this law does is it says you must belong to a heterosexual union in order to receive the benefits. And Rice v. Cayetano and Bray v. Alexandria Women's Health Clinic tell us that even when a statute is clever and it doesn't name a particular group on its face, that doesn't make it any less invidious, any more than a law that says, for example, you must have a particular ancestry in order to be able to vote in a certain set of elections. But the Court also can understand this as being facially, excuse me, as being intentionally discriminatory under the Lazy Y Ranch v. Barain formulation. This is a law that has a discriminatory application or, in fact, it has imposes differential burdens on this group alone. It's clearly what this law does. It's only gay people who have their access cut off and not any other group. Heterosexuals continue to remain eligible. And finally, when there's no legitimate reason for the plan, that, in fact, demonstrates that it raises the inevitable inference that the plan is born of animosity toward the class affected. And that's what we have here. The State has offered a number of interests. Every single one of them can be disposed of as a matter of law, which is precisely what Judge Sedgwick did. There's longstanding Supreme Court precedent that a State cannot achieve cost savings or administrative efficiency savings on the backs of a vulnerable minority group. And so it's not enough for the State to say, well, this would save money. In fact, it would save money to cut the wages of women or to deny Jewish employees family coverage. But that isn't sufficient under the Fourteenth Amendment, and it's no less so for lesbians and gay men. Additionally, I want to explain that the bill, it did a number of things when it defined dependent, when it included other budgetary provisions. But that, in fact, doesn't answer this question. It doesn't have anything to do with the challenged exclusion. Federal legal protection law is very clear that when an exclusion is being challenged, the State interest must at least rationally connect to that exclusion. So, for example, it isn't enough for the State to say we have a number of interests with respect to heterosexuals. We want to favor them. We think it's better to spend money on them. That simply restates the intent to disadvantage gay people, and that's not sufficient. To the contrary, if we look at examples under any level of review, it's clear that the courts always test do the State interests rationally connect to the exclusion of the group, not a desire to be nice to the empowered majority that continues to get the advantages. So in the United States v. BMI, it wasn't enough that the State wanted to continue to give a top-flight military education to men. The Court tested what the interest was in excluding women. In Romer v. Evans, the State said we have an interest in conserving resources to fight discrimination against other groups, and Justice Kennedy said, in not quite so many words, that's a perfectly fine reason to continue to protect those groups against discrimination, but it says nothing about why gay people must be excluded. That is the thing that the State interest must rationally explain, and none of them do here. Sotomayor, do you want to touch on the State's argument that the Court didn't adequately consider whether you should post a bond? Yes. There are, in fact, multiple independent reasons that support Judge Sedgwick's decision to forego a bond. First, it's long been the rule of the night. Did he make a decision not to post a bond? We presume that he did, since he required no bond to be posted, and that decision is, in fact, adequately supported by law. He was asked to do so? Actually, not in the papers, Your Honor, though plaintiffs made it clear in their The defendants didn't even respond in their papers, and it wasn't until the hearing the defendants addressed a bond. So at the hearing, he was requested. But the decision is not clearly erroneous, and, in fact, that's what must be shown for this to be an abuse of discretion. I'm sorry. Did you say that in your papers you said that you did not, you should not have to post a bond? That's correct. We asked in our papers for a nominal bond at most, and it was not until the hearing that the defendants objected to it. So the multiple reasons that this is, in fact, correct under the law of the circuit is that, in fact, it's long been recognized that it's perfectly proper and appropriate to award little or no bond in public interest litigation. Second, particularly in the context of these cases, it can be necessary to avoid foreclosing access to judicial review. That's certainly true here. These are ordinary families of ordinary means. Third, the courts have been particularly sensitive about upholding access to judicial review where Congress has created a private right of action. This, of course, is Section 1983 litigation. And finally, plaintiffs have shown the likelihood of success on the merits. That also weighs in favor of little or no bond. And even though these decisions were not articulated in the district court's opinion, a case cited by defendants, Johnson v. Couturier, makes clear that the court can affirm on a ground, even if not articulated by the district court, as Johnson did, even though the district court had not even addressed reparable harm, the court found that there was implicit support for that. Mr. Verrilli, I wanted to ask you about the brief point two and the reply brief by the State. The first sentence under brief point two is the employee group admits that the district court placed the burden of proof on the State officials, and then cites to your response brief at 24 and 25, which I've reread a number of times, I don't ever see that admission. Am I missing something here? No, Your Honor, we agree. I see my time is up, so I will be brief. The way that this worked is that the district court actually accepted at face value that certain interests were valid. There was no question that the State had an interest in promoting marriage, administrative efficiency or fiscal responsibility. The problem is Section O doesn't even rationally relate to any of those State interests. So we, in fact, satisfied our burden. We negated every conceivable basis for the law, and that's what we're required to do. Thank you very much, Your Honor. Thank you. Mr. Cooper. Your Honor, noting that the court was particularly interested in the district court's finding of irreparable harm, with your permission, I would like to argue that you can use that single factor to prove that each of the arguments that we made, that the court applied the wrong legal standard, requires reversal. First, we believe that in order to find irreparable harm, as we argued, the court took the allegations of the amended complaint as true. Why isn't it enough? May I divert you for a minute? Why isn't it enough, as Judge Sedgwick found, that there's a constitutional violation? I know you disagree that there is one, but assuming that there is one, why isn't that enough to make a showing or an adequate finding of irreparable harm? Your Honor, the case law is not that every allegation of a constitutional harm, even if a court finds there's some substance to it, is sufficient to make irreparable harm for purposes of a preliminary injunction. The case law is that it often is. Yes. So how do you distinguish this? Assuming that there is a constitutional violation, for the sake of argument, I know you would disagree with that. If there's a constitutional violation, why isn't that enough to show irreparable harm here? Your Honor, if there had been record proof of an irreparable harm to the standard required of a preliminary injunction movement, I would say that you are probably right. But in the two cases that we cited on this, and that the district court cited, Monterey Mechanical and Associated General Contractors, what this court did was to send it back to the district court to make that kind of a factual finding, to look at the record and make it so that this court could then review it. When you look at the district court decision here, there aren't those kinds of fact findings, and instead they turn off of the determination that the district court is going to take the allegations of the amended complaint as true. At one level, it's a burden of proof issue, Your Honor. Just to say I have a constitutional violation without any backing to it is never going to satisfy the preliminary injunction standard. There actually has to be proof. And as your questioning during my learned friend Ms. Borelli's comments showed, although there's some allegations in the amended complaint, when you look at the actual proof on the topic of irreparable harm, what you find is people who would find it inconvenient. Well, we have at least two affidavits that go the other way. There's a Zecklinger affidavit that indicates that her partner was refused individual insurance and she investigated other options. And you have the Diaz affidavit indicating that his partner could not locate any individual insurance plans. Right? Your Honor, I think that overstates what those affidavits say. In particular they say that he and his partner went to an insurance broker and the insurance broker said I looked around for you and I couldn't find any plans that would take you with your diabetes and with your cholesterol problem. Your Honor, both the Zecklinger affidavit and the Diaz affidavit fail to exhaust the whole universe of places where insurance coverage can be obtained. There's, of course, the access plan as the plan of last resort in the State of Arizona. Well, I looked at the access plan, and maybe you can correct my interpretation of it, but it appears to me that a joint checking account, which everybody, all the affidavits indicate that they're interdependent financially, and I believe they say they have joint checking accounts, but the income from the non-spouse domestic partner is presumed to be the income for evaluation purposes. Am I correct in that? You know, I don't think it's that simple, Your Honor. Well, I'm looking at section 706.18, financial accounts, where it says, in general deposits to the customer's financial account made by a joint account holder other than the spouse are contributions to the individual unless ownership of the account is successfully rebutted. And that statement starts with a statement that is very common throughout all of the and, you know, most of those are federal. Right. And I don't want to debate you. What's the State's position on that? State's access position? Yes. Obviously, is that it has to apply the standards that will keep it qualified under the Federal plan. Right. But, I mean, just to cut to the chase here, we can pierce through this, but it appears to me, and that's why I'm asking you, because I just don't know the answer to it, and I'm not an expert in Arizona law and Medicaid. It appears to me that you count the non-spouse income if you have a joint checking account as a general rule. Is that true or not? There is a statement that that has to be taken into account in making the determination, but it's not a bright-line rule. The – and I'm not an access expert, either. I don't recognize access – or I don't represent access to have their own lawyers, but we look at it. Right. Well, if that's true, just hypothetically, if that's true, aren't gays and lesbians in a catch-22 if they're off the State plan and yet the State – their partner's State income has to be counted? So if you say – I'm just getting to your statement that you have the Medicaid as the last resort. It seems to me, at least on the Diaz and the other affidavits, you can't get private insurance, and you go to the insurance of last resort, but you have to count your partner's income. You don't have access to the insurance of last resort. Am I wrong on that? Your Honor, on this record, I have to say you are wrong, because it is too complicated a process for us to prognosticate. I'm not aware of any widespread disqualification of applicants. You know, if it's too complicated to figure out and someone has told you that next October you're going to no longer be able to get insurance and you know that you could get hit by a truck the next morning, that's so that you face the prospect of not having any insurance or an incredibly complicated thing to figure out. That seems like it's a pretty bad situation, doesn't it? It's a bad situation, Your Honor, but not irreparable. It's not irreparable, and it's really not the case here. Because, of course, the plan was actually extended for an additional three months. It would have cut off at the first of January. It was about the injunction. Right. But you're not aligned. So there was a time period. I think relevant to this also, you need to take into account that this was a short-lived domestic partner program. And as you can tell from the affidavits of these plaintiffs, these are people who have been in long-term committed relationships for a very long time. It is not logical that suddenly, because there was a short-lived domestic partner benefit offered by the state, everything that those people did to take care of themselves and their children and their domestic partners before, in some cases in the decades before, suddenly wasn't available to them anymore. And I guess to the technical point, none of these affidavits say they applied to Access. Okay. Because you can do that. And if Access says no, well, then it could be in the affidavit and we'd know. But that didn't happen. Right. We're way into the red. Thank you. Thank you, Your Honor. I appreciate your indulgence. The case just argued is submitted for decision. That concludes the Court's oral argument calendar this morning. The Court stands adjourned. All rise. This Court is adjourned.
judges: Schroeder, Thomas, Cjj Bennett (Iowa), Dj